UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JASON D. MANSFIELD, | |
| Plaintiff, | |
| v. | No. 22 CV 6603 |
| LOWE'S HOME CENTERS, LLC, | Judge Manish S. Shah |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jason Mansfield worked for defendant Lowe's Home Centers, LLC. Mansfield was not hired as a store manager for a Lowe's store in Lincolnwood, Illinois, but was instead hired as an assistant store manager there. He also applied for but was not hired for a "bench" store manager position at a Lowe's in Arlington Heights. When Mansfield, an African American man, mentioned the lack of diversity in hiring store managers to a fellow assistant store manager, his district manager pulled him aside and made racist comments. After complaining to the Lincolnwood store manager about these comments, Mansfield was put on a performance improvement plan, was more heavily scrutinized, and says that Lowe's cut his responsibilities. He alleges racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964. Lowe's moves for summary judgment. For the reasons discussed below, the motion is granted.

1

**I.     Legal Standards**

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant is entitled to summary judgment if the plaintiff "cannot present sufficient evidence to create a dispute of material fact regarding any essential element of her legal claims on which she bears the burden of proof." *Burton v. Bd. of Regents*, 851 F.3d 690, 694 (7th Cir. 2017). I view all the facts and draw reasonable inferences in favor of the non-moving party to determine whether summary judgment is appropriate. *See Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022).

**II.    Facts**

Plaintiff Jason Mansfield is an African American man who was hired by defendant Lowe's Home Centers, LLC to be an assistant store manager at their Lincolnwood store. [38] ¶ 2.[1] He had originally applied for the position of store manager there and was interviewed by District Manager Tom McLaughlin but was

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. In the case of citations to depositions, I also use the deposition transcript's original page numbers. The facts are largely taken from the plaintiff's response to defendant's Local Rule 56.1 statement of facts, [38], and defendant's response to plaintiff's statement of additional facts, [41], where both the asserted fact and the opposing party's response are set forth in one document. Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006); *see* [38] ¶ 32. The parties dispute many facts, but the facts in those disputes are not all material. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include both sides' versions, understanding that the nonmovant is entitled to favorable inferences.

not selected for the position. [38] ¶ 9. Instead, Windi Kearney, a white woman, was hired. [38] ¶ 10. Kearney had previously worked as a Lowe's store manager in two different stores in Louisiana before being hired as store manager at the Lincolnwood store and had a recommendation from her district manager in Louisiana. [38] ¶ 10. Mansfield had not been a Lowe's store manager before, but had been a store manager at Home Depot, an assistant store manager at a Lowe's in Chicago, and had held other management positions at both Lowe's and Home Depot. [38] ¶¶ 1, 10; [41] ¶¶ 61–63.

When he found out he was not hired as store manager, Mansfield applied for and was hired as assistant store manager at the Lincolnwood store. [38] ¶ 12; [41] ¶ 65. Kearney was Manfield's direct supervisor. [38] ¶ 3. McLaughlin, the district manager, supervised twelve stores including the Lincolnwood store. [38] ¶ 3. After he accepted the assistant store manager position, Mansfield also applied to Lowe's in Arlington Heights for the position of "bench" store manager, which is a training management position that typically leads to placement as a full-time store manager when a position opens up. [38] ¶ 13; [41] ¶ 67. Mansfield was never interviewed for the position. [38] ¶ 14; [41] ¶ 68. McLaughlin says he had no knowledge that Mansfield had applied for the position, but Mansfield says he spoke with McLaughlin about the position and asked if it would be possible for him to shift into the role. [38] ¶¶ 14, 39; [41] ¶ 67; [38-1] at 14 (49:15–19). Ultimately, Azzouz Najah, a non-African American man, was hired for the "bench" spot. [38] ¶ 13; [41] ¶ 69. According to Mansfield, Najah did not have a background in home improvement. [38-1] at 18

3

(62:19–20). When Mansfield asked McLaughlin about never being interviewed for the position, McLaughlin responded, "we have plans for you." [41] ¶ 68.

As assistant store manager, Mansfield was responsible for about nine different departments. [38] ¶ 15; [41] ¶¶ 70–71.[2] He supervised department supervisors and was expected to train, coach, and discipline associates in the departments if necessary. [38] ¶ 15. Kearney testified that she did not believe Mansfield's performance was satisfactory. [38] ¶ 16. McLaughlin also testified that he did not believe Mansfield was meeting expectations, specifically that he did not follow up with associates or give them clear direction, and did not hold them accountable. [38] ¶ 17. McLaughlin coached Mansfield about holding associates accountable for poor work, even when Mansfield was not working when the issues occurred. [38] ¶ 19. McLaughlin said that Mansfield did not regularly provide feedback and discipline to associates and department supervisors. [38] ¶ 18. However, the store was short-staffed in 2020, and because of that, the store's staff could not always perform all of their duties at certain times. [41] ¶¶ 79–80. Mansfield also points out that he issued eCARs (electronic corrective action reports) on a regular basis and had plans in place for his staff to follow when he was not in the store. [38] ¶¶ 18–19. Mansfield did not

---

[2] Mansfield also says that he was a "merchandising" assistant store manager. He asserts two conflicting facts: that this manager is responsible for some departments, other than the back end (receiving) and front end (cashiers and customer service), [41] ¶ 70, and that this manager is responsible for *all* departments aside from the front and back-end departments. [41] ¶ 71. He also admits to the fact that this manager is responsible for certain departments that align with the departments listed in ¶ 70. [38] ¶ 15. Based on this admission, I take the fact in [41] ¶ 71, which is consistent with [38] ¶ 15, to be true.

4

receive any eCARs, demotions, or pay cuts despite McLaughlin and Kearney's beliefs. [38] ¶ 20.[3]

Mansfield complained to another assistant store manager about the lack of racial diversity in the district. [38] ¶ 47, [41] ¶¶ 72–73. After that complaint, McLaughlin began coming to the Lincolnwood store to do "walkthroughs" multiple times a week, and blamed Mansfield for things that happened when he was off duty. [48] ¶ 48. One day, McLaughlin yelled at Mansfield, saying, "you think I don't know I have one of the worst districts for diversity? I've done plenty for you people, you black people. You guys just don't understand the basics." [41] ¶ 73.[4] Mansfield also said that McLaughlin spoke to him about the protests surrounding the police killing of George Floyd. [38] ¶ 60.[5] Mansfield complained to Kearney about this interaction. [41] ¶ 72.[6] A few days later, Mansfield was placed on a performance improvement plan. [41] ¶ 72; [38] ¶ 24.

Kearney testified that she made the decision to place Mansfield on a PIP, and spoke with McLaughlin about it, but Mansfield says that Kearney told him that it was McLaughlin's decision to place him on a PIP. [38] ¶ 21. The PIP indicated that plaintiff needed to model and set expectations to department supervisors, drive

---

[3] Mansfield denies this, by reference to the actions he argues were adverse, but those actions were not eCARs or pay cuts, and were not formal demotions.

[4] McLaughlin says he never said this. [38] ¶ 58; [41] ¶¶ 72–73.

[5] Again, McLaughlin denies he spoke with Mansfield about this. [38] ¶ 60.

[6] Mansfield also says Kearney told him that McLaughlin had said that the Lowe's chief executive officer, an African American man, did not know what he was doing. [38] ¶ 57. Lowe's disputes that Mansfield ever heard Kearney say this. [38] ¶ 59. Lowe's is correct; Mansfield's testimony was that statement was his "interpretation" of what Kearney said that McLaughlin said. [38-1] at 25 (90:6 to 24).

5

business results, achieve merchandising standards, and keep products in stock. [38] ¶ 23. Mansfield claims he was told he was on probation, and that the PIP was disciplinary. [38] ¶¶ 24, 53; [41] ¶ 75. Meanwhile, he was not demoted from his formal position, nor were his pay or benefits cut. [38] ¶ 24. He also did not receive an eCAR. [38] ¶ 24, 53. In response to being place on the PIP, Mansfield emailed Lowe's chief executive officer complaining of race discrimination and retaliation for his previous complaint about perceived lack of diversity. [38] ¶¶ 50, 52.

About three weeks after his PIP was issued, Mansfield took COVID leave for two months. [38] ¶ 25. Before he left, Kearney told Mansfield that the store would be hiring an additional assistant store manager because the store was so busy and Mansfield had too many duties on his own. [38] ¶¶ 27–28. Kearney told Mansfield that he and the new assistant store manager would split the departments equally. [38] ¶¶ 29–30.[7]

When he returned from COVID leave, Kearney told Mansfield that he was assigned only to the lawn and garden department. [41] ¶ 76.[8] Mansfield says that Kearney told him that while he was gone, the new assistant store manager had been hired and "he took over all [Mansfield's] departments," and that she was "going to

---

[7] Lowe's is correct that Mansfield's testimony here is inconsistent. Mansfield testified both that he was told his responsibilities would be reduced to "just the outside garden section for the time being," and also that the plan was for him and the new assistant store manager to split the departments evenly. [38] ¶ 27; [38-1] at 36–37 (135:23–136:6, 137:21–138:20); 39 (146:18–147:1); [41] ¶ 76. Mansfield denied he ever said that Kearney told him before he left that his duties would be reduced to one department. [38-1] at 39 (147:5–18).

[8] Kearney says she told Mansfield that departments would be split equally between the two assistant store managers. [38] ¶ 27, 29–30. Mansfield agrees that this is what he was told before he left, but when he came back, his duties were reduced to one department. [41] ¶ 76.

6

start [Mansfield] in the garden center and that's going to be your department." [38-1] at 38 (145:3–9). The receiving department manager at the time testified that Mansfield "always used to be in garden" and "hide out" in the garden department. [41] ¶ 78. Mansfield describes this as a "humiliating" demotion. [41] ¶ 77; [38] ¶ 53. However, his pay and benefits were not cut, he did not receive any eCARs, and his title did not change. [38] ¶ 31.[9]

About three weeks after he returned from COVID leave, Mansfield submitted his resignation. [38] ¶ 32.

### III. Analysis

#### A. Racial Discrimination

Title VII prohibits employers from "fail[ing] or refus[ing] to hire... any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The "legal standard… is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "'[T]o hold [Lowe's] liable, [Mansfield] must show that [his] race played a part in' the hiring decision." *Barnes-Staples v. Carnahan*, 88 F.4th 712, 715–16 (7th Cir. 2023) (quoting *Crain v. McDonough*, 63 F.4th 585, 591 (7th Cir. 2023)). In evaluating Mansfield's claims, "we ask whether 'a reasonable jury [could] find based on all available evidence

---

[9] Mansfield disputes this but the record citations do not contradict the asserted fact.

7

that a discriminatory… motive caused' [Lowe's] to select a different candidate for the [store manager] job over [Mansfield]." *Id.* at 716 (quoting *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 569 (7th Cir. 2017)).

There is no difference between "direct" or "indirect" evidence; "[i]nstead, all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766. I "ultimately consider all admissible evidence as a whole 'and determine whether a reasonable jury could find that the plaintiff suffered an adverse action because of his protected characteristics.'" *Anderson v. Mott Street*, 104 F.4th 646, 652–53 (7th Cir. 2024) (quoting *Singmuongthong v. Bowen*, 77 F.4th 503, 508 (7th Cir. 2023)).

Mansfield argues that he was not hired as the Lincolnwood store manager or the Arlington Heights bench store manager based on his race. He claims that he was more qualified than both Kearney (for the Lincolnwood position) and Najah (for the Arlington Heights position).

Lowe's argues that Kearney was chosen as the Lincolnwood store manager because she was already a Lowe's store manager who came with the recommendation of her district manager, so "McLaughlin knew that Kearney could perform the store manager duties satisfactorily." [32] at 5. Lowe's points out that while Mansfield had been a Lowe's assistant store manager, he had never been a Lowe's store manager so "McLaughlin could not have the same assurances regarding his ability to perform the job." [32] at 5. Finally, Lowe's provided feedback to its recruiter that Mansfield's "energy was low" during his interview. [38] ¶ 11.

8

In support of his claim that he was not hired for the Lincolnwood position based on his race, Mansfield only argues that a "white person with slightly less experience" was hired instead. [39] at 2. He does not argue that McLaughlin's comments about doing "plenty for you people, you black people," and about the George Floyd protests are probative of that earlier hiring decision. Instead, by his own account, the evidence of racial bias in the decision to hire Kearney is based on comparing his managerial experience to Kearney's. [39] at 2 ("The key facts are that the Plaintiff, who had a large amount of experience in the home remodeling retail business, including a six year tenure as a store manager at Home Depot, and prior employment with Defendant Lowe's, … was not hired as a store manager in 2019 when he applied but a white person with slightly less experience, was hired."). Mansfield's discriminatory hiring argument instead focuses largely on the bench store manager position. *See* [39] at 2, 6, 7. Lowe's, on the other hand, has put forth evidence that Kearney had already been a Lowe's store manager at two stores—unlike Mansfield—and had a recommendation from the Lowe's district manager who supervised her at those two stores. "An employee's 'own opinions about [his] … qualifications [do not] give rise to a material factual dispute.'" *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 381 (7th Cir. 2020) (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996)). "A court is not a 'super personnel department that second-guesses employers' business judgments.'" *Riley v. Elkhart Comm. Schs.*, 829 F.3d 886, 895 (7th Cir. 2016) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002)). But if an employer fails

9

to hire someone "clearly better qualified" than the person chosen, judicial intervention may be appropriate. *Id.*

Mansfield was not "clearly better qualified" than Kearney, who had held the exact position she was applying to and had the recommendation of her supervisor. *See Hambrick v. Kijakazi*, 79 F.4th 835, 843–44 (7th Cir. 2023) (granting summary judgment where the younger, white applicant had come "highly recommended" by his first-line supervisor). Because there is no genuine dispute to suggest that Mansfield was clearly better qualified than Kearney, and that is the only argument Mansfield makes, summary judgment is granted as to the failure to hire Mansfield for the Lincolnwood location claim.

Mansfield has also not put forth facts that would allow a jury to find that he was not hired for the Arlington Heights bench store manager position because of his race. Mansfield says he applied online at Lowescareers.com and discussed the position with McLaughlin. [38] ¶ 14. Mansfield said he "reached out to McLaughlin about the bench position" and asked, if there was "any way or would it be possible to shift me into that position," but McLaughlin "never responded." [38-1] at 14 (49:15–19), 16 (56:17–19). There are no facts that show that McLaughlin had seen Mansfield's application on the Lowe's career website, or that the application was submitted before McLaughlin decided to hire Najah. Mansfield expressed interest in shifting into the role, but he offers no evidence to support even a circumstantial inference that McLaughlin knew about his application and chose Najah over

10

Mansfield.[10] There is not enough in the record to show that McLaughlin knew Mansfield had applied at the time Najah was hired. Absent evidence that McLaughlin knew about Mansfield's application, no jury could find that McLaughlin failed to hire Mansfield because of his race.

Because Mansfield has failed to show a genuine issue that McLaughlin's decisions were because of Mansfield's race, summary judgment is granted on Mansfield's discrimination claims.

### B. Retaliation

The antiretaliation provision of Title VII prohibits an employer from "discriminat[ing] against" an employee who "opposed any practice" that is unlawful under Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a). This provision "prevent[s] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). To survive summary judgment, Mansfield must show (1) he engaged in activity protected by Title VII; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and

---

[10] For example, there's no evidence in the record that McLaughlin had access to all applications on the Lowe's website and would have known about the entire applicant pool before selecting Najah. *See Ellison v. United States Postal Serv.*, 84 F.4th 750, 759 (7th Cir. 2023) (summary judgment is the moment in a lawsuit when a party must reveal what evidence it has to convince a jury). McLaughlin's statement, "we have plans for you," was in response to Mansfield saying he wanted to move up in the future, and was not an acknowledgement that McLaughlin had selected Najah as the bench manager over Mansfield. *See* [38-1] at 16 (56:22–24); *see also* [38-1] at 17 (58:1–7). A jury could not conclude from the statement that McLaughlin knew about Mansfield's application.

11

the adverse action. *Jokich v. Rush Univ. Med. Center*, 42 F.4th 626, 633 (7th Cir. 2022).

In retaliation cases, like employment discrimination cases, the question is "whether the evidence would permit a reasonable factfinder to conclude" that the retaliatory motive "caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765; *Igasaki v. Ill. Dep't of Fin. & Prof. Reg.*, 988 F.3d 948, 959 (7th Cir. 2021). An action is adverse when it would dissuade a reasonable worker from making or supporting a charge of discrimination. *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). Relevant causation evidence "may include 'suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual.'" *Alley v. Penguin Random House*, 62 F.4th 358, 361 (7th Cir. 2023) (quoting *Rozumalski v. W.F. Baird & Assocs.*, 937 F.3d 919, 924 (7th Cir. 2019)).

Mansfield sets forth two retaliatory actions: (1) that McLaughlin harassed him after Mansfield's complaint to his coworker about the lack of diversity by "fly specking" him and more frequently checking in on the store and (2) that he was placed on a performance improvement plan within days of complaining to Kearney about the racist remarks McLaughlin made. [39] at 8.

First, increased scrutiny is not an actionable adverse employment action. Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Lewis v. Wilkie*, 909 F.3d 858, 868 (7th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). Retaliatory

harassment by a supervisor can rise to the level of a materially adverse employment action "if it is severe enough to cause a significant change in the plaintiff's employment status." *Stutler v. Ill. Dep't of Corrs.*, 263 F.3d 698, 703 (7th Cir. 2001).

There is no evidence that McLaughlin visiting the store multiple times a week caused a change in Mansfield's employment status. Mansfield maintained his title, salary, and responsibilities during this time. Mansfield points to no specific harm done simply from McLaughlin "fly specking" him more often. Although the increased scrutiny may be "evidence of retaliatory intent behind a more concrete adverse action," *Lewis*, 909 F.3d at 868 (internal quotations omitted), on its own, the increased scrutiny is not a concrete injury to Mansfield that can support a retaliation claim.

Second, "[p]erformance improvement plans, particularly minimally onerous ones… are not, without more, adverse employment actions." *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022) (quoting *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011)); *see also Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 626 (7th Cir. 2019) (negative performance reviews and performance improvement plans are not adverse employment actions); *Boss*, 816 F.3d at 917–18 (performance improvement plan is not an adverse action for a Title VII retaliation claim). It does not matter whether the PIP was "probationary" or "disciplinary" as Mansfield argues. *See Fuller v. McDonough*, 84 F.4th 686 (7th Cir. 2023) (reprimands under an employer's progressive discipline system "do not implicate job consequences tangible enough to establish an independent bass for Title VII liability"); *Fields*, 928 F.3d at 625 ("But initiating disciplinary procedures does

13

not necessarily mean that an employer is preparing to fire an employee because the employer could, for example, hope that criticism will lead to better performance by the employee.").

There is nothing in the record to suggest that the PIP here was particularly onerous. Mansfield has not "adduce[d] admissible evidence that his… PIP [was] tied to" any "tangible job consequence." *Boss*, 816 F.3d at 919. Mansfield did not have his pay cut, his title changed, or have any eCAR filed against him. He also does not allege that the PIP itself led to his duties being cut, or that his responsibilities were cut as a part of his PIP. Because PIPs are not adverse employment actions, summary judgment is granted as to his retaliation claim based on the PIP.

Mansfield also claims he was constructively discharged by having his job responsibilities cut to just one department when he returned from COVID leave. [39] at 6. Constructive discharge is a "situation in which an employer, without firing an employee, makes his working conditions so miserable that it drives him to quit." *Hunt*, 219 F.3d at 655. There are two types of constructive discharge: (1) when a plaintiff resigns due to "discriminatory working conditions even more egregious than that required for a hostile work environment claim," and (2) "when an employer acts in a manner that would make clear to a reasonable employee that she will be immediately fired if she does not resign." *Fields*, 928 F.3d at 625 (internal citations omitted). "Conditions amounting to constructive discharge must be pervasive and extreme." *Beverly v. Abbott Labs.*, 107 F.4th 737, 745 (7th Cir. 2024). "Egregious working conditions alone are not enough to prevail on a constructive discharge claim,

14

however. The law requires the employee to go further by showing that seeking redress from the employer would be futile." *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022). If an employee who is not in immediate danger quits without notifying the employer of the egregious harassment, there is no constructive discharge. *Id.*; *see also Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 639–40 (7th Cir. 2009) (noting the "constructive discharge test sets a high bar in order to give an employer an opportunity to address the situation before an employee resigns").

Mansfield argues his claim under the first category: that he was "forced to resign because his working conditions became so intolerable that a reasonable person would have felt compelled to resign." [39] at 9. He says that his responsibilities being cut to one department was a "humiliation that could not be reasonably endured." [39] at 6. In some cases, a "drastic diminution of duties," especially for a "highly educated employee, … might suffice as a 'constructive discharge.'" *Neal v. Honeywell, Inc.*, 191 F.3d 827, 830 (7th Cir. 1999). But though a change in responsibilities may be an adverse employment action, it does not always rise to the level of a constructive discharge. *See, e.g.*, *Ulichny v. Merton Comm. Sch. Dist.*, 249 F.3d 686, 703–04 (7th Cir. 2001) (finding no constructive discharge where although plaintiff's duties were greatly reduced, she was not stripped of all her duties and her remaining assignments were not "totally unexpected" of teachers and administrators). The question is "whether a reasonable employee would have found [his] working conditions so inappropriate to [his] skill level that they 'made remaining in the job unbearable.'" *Id.* (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)). In *Neal*,

15

the plaintiff not only had her responsibilities cut to two responsibilities, but also was harangued for being a whistleblower by her immediate supervisor, and subjected to public, violent threats by a manager. *Id.* at 829–31.

Mansfield alleges that despite retaining his title and salary, his duties were reduced to one department. He only remained at Lowe's for another three weeks before submitting his resignation. There is no evidence that he raised the issue with McLaughlin, Kearney, or the Lowe's HR department before resigning. There is no evidence he was in any danger. Because he has not shown that he sought redress for the harassment, or here, the diminution of his duties, there is no constructive discharge. *Stamey*, 37 F.4th at 1225. Mansfield has similarly not demonstrated that any attempt at redress would be futile. *Id.* Summary judgment is granted as to his constructive discharge claim.

Under the second category of constructive discharge, Mansfield also cannot show a genuine dispute of fact that he would be "immediately fired" if he did not resign. *Fields*, 928 F.3d at 625. To show constructive discharge under this second category, the plaintiff must offer evidence that his firing was "an imminent and inevitable event." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). "[T]he prospect of being fired at the conclusion of an extended process," without more, does not meet this standard. *Swearnige Cigan v. Chippewa Falls Sch. Dist.,* 388 F.3d 331, 333–34 (7th Cir. 2004). Although his responsibilities were cut, Mansfield had just come off a two-month leave with COVID. Kearney had also told him he would "start" at just lawn and garden. There was no indication he would stay there forever.

16

He maintained his title and compensation when he returned. And importantly, he "did not provide ample time to test" any "hypothesis regarding the dead-end natured of" the changes, as he "tendered [his] resignation… merely a few weeks" after he returned from COVID leave. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 411 (7th Cir. 2008). There are no facts to support that he would be "immediately fired" if he did not resign, and so was not constructively discharged.[11]

Even if having his responsibilities cut created an "intolerable" work environment, Mansfield has not connected the reduction in duties to his reporting of McLaughlin. The reduction in duties came after he had been out on COVID leave for two months. [41] ¶ 76, [38] ¶ 25–26. He took that leave about three weeks after his complaint. "Suspicious timing is rarely enough to create a triable issue." *Khungar v. Access Comm. Health Network*, 985 F.3d 565, 578 (7th Cir. 2021) (quoting *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009)). For suspicious timing to provide evidence of causation, a plaintiff must demonstrate that "an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct." *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001). Typically, only a

---

[11] Though Mansfield's complaint alleges constructive discharge as a theory of discrimination, [1] ¶ 35, he makes no arguments in his brief to support that he was constructively discharged because of his race, and only argues it was in retaliation for his complaint about McLaughlin. *See* [39] at 5 ("Though the Defendant focuses solely on the indirect method, here, a large amount of circumstantial evidence exists showing that the Plaintiff retaliated against and constructively terminated because he complained about the lack of racial diversity in management and complained about his District Manager's reaction to his complaint."); [39] at 6, 8–9. Even if he did make the argument, any discrimination claim based on constructive discharge suffers from the same failure of proof discussed above.

17

few days can elapse between the protected activity and the adverse action to draw an inference of causation based on suspicious timing. *Daza v. Indiana*, 941 F.3d 303, 309 (2019); s*ee also Davis*, 651 F.3d at 675 (finding that even when a discharge comes "close on the heels" of a protected activity, the inference that the discharge is because of the protected activity does not apply if there is a "significant intervening event separating" the complaint from discharge). A plaintiff may survive summary judgment when suspicious timing is not enough if "there is other evidence that supports the inference of a causal link." *Daza*, 941 F.3d at 309 (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)).

Nearly three months had passed from when Mansfield had complained about McLaughlin. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (holding that a four-month gap between an EEOC complaint and plaintiff's firing was not enough to establish a causal connection between the two). He had worked for three weeks before taking COVID leave, and his duties had not been cut. He also admits that at least some duties were planned to be cut when management decided to hire a new assistant store manager due to an increase in business. [38] ¶ 28. While he alleges his duties were not cut by half, like he had expected, but instead cut to just one department, he provides no evidence connecting that reduction to his complaint about McLaughlin. Mansfield makes no argument at all regarding causation, instead summarily saying that he was "constructively terminated because he complained about the lack of racial diversity in management and complained about his District Manager's reaction to his complaint." [39] at 6. Without any

18

evidence of causation, a jury cannot conclude that Mansfield's complaint about a lack of racial diversity or his complaint to Kearney about McLaughlin's response was the cause of his reduced duties. Looking at the evidence as a whole, *Ortiz*, 834 F.3d at 765, there is no basis to connect Mansfield's protected activity to the reduction in his responsibilities. Lowe's is entitled to judgment as a matter of law on Mansfield's retaliation claim.

## IV. Conclusion

Defendant's motion for summary judgment, [31], is granted. Enter judgment in favor of defendant and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: December 3, 2024